## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **KEVIN BARRY**<br>**2612 Pine Knot Drive**<br>**Vienna, Virginia 22181,** | ) ) ) ) | |
| **ALAN BIGLER**<br>**251 West Blakeley Drive**<br>**Charles Town, West Virginia 25414,** | ) ) ) ) | |
| **JOHN McKENNAN**<br>**3350 South Stafford Street**<br>**Arlington, Virginia 22206,** | ) ) ) ) | |
| **MICHAEL MILROY**<br>**225/859 Moo 13, Baan Waen,**<br>**Hang Dong, Chiang Mai 50230**<br>**Thailand** | ) ) ) ) ) | |
| **PATRICK RUEFLE**<br>**3960 Pine Street**<br>**Allison Park, Pennsylvania 15101** | ) ) ) ) | |
| **BERNARD J. WOERZ**<br>**P.O. Box 2094**<br>**(96 Waterview Drive)**<br>**Miller Place, New York 11764, and** | ) ) ) ) ) | Civil Action No. 1:16-cv-_____ |
| **JEREMY S. ZEIKEL**<br>**74 Ruffed Grouse Ct.**<br>**Chapel Hill, North Carolina 27517,** | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| **THE ISLAMIC REPUBLIC OF IRAN,**<br>**c/o Ministry of Foreign Affairs**<br>**Khomeini Avenue**<br>**United Nations Street**<br>**Tehran, Iran, and** | ) ) ) ) ) ) ) | |
| Defendant. | ) ) ) | |

## COMPLAINT

(alleging, *inter alia*, acts of terrorism under 28 U.S.C. § 1605A,
resulting in serious physical and psychological injuries)

### Introduction

1.      This is a Complaint alleging that Defendant, the Islamic Republic of Iran ("Iran"),

through its agency and instrumentality the Ministry of Information and Security ("MOIS"), was

responsible for injuries to Plaintiffs Kevin Barry, Alan Bigler, John McKennan, Michael Milroy,

Patrick Ruefle, Bernard Woerz, and Jeremy Zeikel, in the terrorist bombing of the United States

Embassy Annex in East Beirut, Lebanon, on September 20, 1984.  All seven Plaintiffs were

American citizens serving their country on the day of the terrorist attack.

2.      This case arises out of the same acts and/or incidents as those in five separate cases

in which this Court has held Defendant liable for injuries sustained by victims of the 1983 and 1984

American Embassy bombings in Beirut.  See *Doe v. Islamic Republic of Iran*, 808 F. Supp.2d 1 (D.D.C.

2011) (Bates, J.), *Welch v. Islamic Republic of* Iran, 2007 U.S. Dist. LEXIS 99191 (D.D.C. Sept. 20,

2007) (Bates, J.), *Dammarell v. Islamic Republic of Iran*, 281 F. Supp.2d 105 (D.D.C. 2006) (Bates, J.),

*Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 105 (D.D.C. 2005) (Bates, J.), and *Wagner v. Islamic

Republic of Iran*, 172 F. Supp.2d 128 (D.D.C. 2001) (T.P. Jackson, J.).  In all of these cases, Defendant

Iran was held liable for acts of state sponsored terrorism, with judgments entered against it

accordingly.

3.      Plaintiffs Kevin Barry, Alan Bigler, John McKennan, Bernard Woerz, and Jeremy

Zeikel were foreign service officers stationed at the U.S. Embassy Annex at the time of the terrorist

attacks. Plaintiff Michael Milroy was a State Department employee at the embassy while his wife was

stationed and served there as a foreign service officer. Plaintiff Patrick Ruefle was a United States

Marine Corps ("USMC") Corporal assigned to guard the embassy.  All were recognized for their

valor, courage, and loyalty as a result of their ordeals.

4.      Plaintiffs were not aware of, and therefore did not participate in, any of the earlier litigation.  They now seek compensatory and punitive damages against the Defendant Iran for what they suffered.

## Jurisdiction and Venue

5.      This Court has jurisdiction over this Action pursuant to 28 U.S.C. §§ 1330(a), 1605A, and 1610.

6.      Venue is proper in this District by virtue of 28 U.S.C. § 1391(f)(4).

## Parties

7.      Plaintiff Kevin Barry, is a United States citizen, and a resident of the State of Virginia.

8.      Plaintiff Alan Bigler is a United States citizen, and a resident of the State of West Virginia.

9.      Plaintiff John McKennan is a United States citizen, and a resident of the State of Virginia.

10.      Plaintiff Michael Milroy is a United States citizen, and a resident of the Kingdom of Thailand.

11.      Plaintiff Patrick Ruefle is a United States citizen, and a resident of the State of Pennsylvania.

12.      Plaintiff Bernard Woerz is a United States citizen, and a resident of the State of New York.

13.      Plaintiff Jeremy Zeikel is a United States citizen, and a resident of the State of North Carolina.

14.      Defendant The Islamic Republic of Iran ("Iran") is a foreign state that is now and has been designated a "state sponsor of terrorism," as that term is defined in 28 U.S.C. § 1605A(h)(6),

pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. Appx. § 2405(j)), and

Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), since January 19, 1984.  This

Court has repeatedly held that Iran was responsible for carrying out the terrorist bombing of the U.S.

Embassy in East Beirut in 1983, as well as the attack on the U.S. Embassy Annex in West Beirut the

following year on September 20, 1984, which led to Plaintiffs' injuries and the deaths of

approximately 12 embassy employees.  Among the dead were two Americans from the defense

attaché's office, Michael Ray Wagner and Kenneth V. Welch (*see Welch* and *Wagner, supra,* and at ¶ 66),

and 10 foreign service national employees.

15.     Defendant Iran provided "material support and resources," as that term is defined in

18 U.S.C. § 2339A, to MOIS, the perpetrators of the 1984 attack on the U.S. Embassy Annex

building.  MOIS is the agency or instrumentality of Iran that was, and still is, the vehicle for the

perpetration of terrorist acts and other acts of violence against Western targets, including United

States nationals and property.  MOIS acted as an agent of Iran, performing acts within the scope of

its agency, within the meaning of 28 U.S.C. § 1605A(c).

16.     Defendant, as a state sponsor of terrorism, is not entitled to sovereign immunity, and

is fully answerable for its actions in this Court.

17.     The passage of time does not constitute a bar to Plaintiffs' actions seeking a judicial

remedy for their injuries, so long as the Defendant has had "sufficient notice of the nature of the

suit and the type of claims against" them.  *See In re Islamic Republic of Iran Terrorism Litigation*, 659 F.

Supp. 2d 31, 106 (D.D.C. 2009) (Lamberth, C.J.), and *Doe, Welch, Dammarell, Salazar, and Wagner,*

*supra, inter alia*.  Defendant has been aware since at least 2000 (when *Wagner* was filed) that litigation

asserting its liability for the Embassy bombings is pending before this Court.

## The Facts

18.     Plaintiffs respectfully direct the Court to the statement of the facts concerning the background and commission of the 1984 U.S. Embassy Annex bombing in East Beirut, and the involvement of Iran and MOIS in that terrorist assault, articulated (*inter alia*) by Judge Jackson in *Wagner*, *supra*, 172 F. Supp.2d 128, 130-35, and by Judge Bates in *Dammarell*, *supra*, and in *Doe, supra*, 808 F.Supp.2d 1, 7 ("Iran and MOIS directed and facilitated the 1983 and 1984 attacks on the U.S. Embassy and therefore proximately caused the injuries sustained by the victims of those attacks"). This Court's factual findings in the *Dammarell* litigation are found at 281 F.Supp.2d 105 (D.D.C. 2003); 2005 WL 756090 (D.D.C. Mar. 29, 2005); 370 F.Supp.2d 218 (D.D.C. 2005); 404 F.Supp.2d 261 (D.D.C. 2005) (containing factual findings expressly incorporated into the final judgment); and 2006 WL 2583043 (D.D.C. Sept. 7, 2006).  *See Doe*, 808 F. Supp.2d 1, 6 n.1.

19.     The judicial resolution of the question of Defendant's liability for the September 20, 1984 embassy attack, and therefore for Plaintiffs' injuries, constitutes *res judicata*, and is not subject to reopening in these proceedings.

20.     Plaintiffs Barry, Bigler, McKennan, Milroy, Ruefle, Woerz and Zeikel were all federal government employees who were, at the time of the attack on September 20, 1984, carrying out their assigned duties at the U.S. Embassy Annex in East Beirut, Lebanon.

21.     Plaintiffs' injuries on that day were the direct and proximate result of the willful, wrongful, and intentional actions by terrorist individuals and organizations funded by Defendant Iran through its agent, MOIS.

## Plaintiffs Alan Bigler and Jeremy Zeikel
### (Plaintiff Bigler)

22.     On September 20, 1984, Plaintiffs Bigler and Zeikel were the Regional and Deputy Regional Security Officers, respectively, of the U.S. Embassy Annex in East Beirut.

23.     On the day Defendant Iran bombed the embassy, Mr. Bigler and Mr. Zeikel were meeting in the cafeteria to discuss security matters when Mr. Bigler heard gunshots.  He immediately attempted to move toward the front of the building and the source of the shots. But an explosion occurred before he could exit the cafeteria.  The room's glass and aluminum front door flew into him from the blast.  His head and body caught the full force of the door frame blown off its hinges, sending Mr. Bigler (and the door) flying back across the room and tables.

24.     Plaintiff Bigler was presumed dead.  He was placed in a body bag and onto a truck with other bodies to be taken to the morgue before someone saw movement in his bag, pulled him out of it, and put him on an ambulance to be taken to a local hospital.

25.     Upon regaining consciousness at the hospital, Mr. Bigler could not see.  Most of his teeth were missing.  His head was severely wounded, including a diagonal laceration across his face. He had a severe headache, and severe pain in his chest and left leg.  His left arm was bleeding badly, and his index finger hung by a tendon.  He was soon moved into surgery.

26.     Approximately five hours later, Mr. Bigler awoke to a bearded man in a white robe standing over his gurney. Because he still did not know what had happened, and because he had been in a war zone for so long, Mr. Bigler thought the man was stabbing him before he realized that the pain he felt was the man removing glass shards from his chest.

27.     After two days in the Beirut hospital, Mr. Bigler was transported by helicopter to Larnaca, Cyprus, and then onto an awaiting USAF medevac flight to the U.S. Army Landstuhl Regional Medical Center in Landstuhl, Germany.  He was there for approximately one week being treated extensively for the repair of the lacerations and broken bones in his face, his head trauma, his broken nose and sinuses, a deep cut to his left thigh, and multiple lacerations.

28.     From Landstuhl, he was medevaced to Frankfurt, Germany, and was boarded onto a U.S. military flight to Andrews Air Force base.

29.     Mr. Bigler received extensive treatment over the next year: psychological testing for short term memory loss; repair of his nearly severed finger; dental work to replace his missing teeth; and nose, sinus, and facial surgeries.

30.     He later underwent additional testing when he started having difficulty forming letters when he wrote.  His treating physician determined after a brain scan that, as a result of the concussion Mr. Bigler suffered from the bomb blast, the nerves in his brain had been damaged, and the resulting scar tissue was causing his brain to not be able to communicate with his fingers. Although the doctor said other nerves might eventually compensate, they never have.

31.     Mr. Bigler continues to suffer residual physical and psychological injuries to this day. He has pain in his left leg.  He still experiences head pain.  He has no feeling in his right jaw which leaves him self-conscious of food and drink that he cannot feel on his chin.  He has a facial scar from the top of his head to his chin. He has false teeth.  He now types his notes, because when he writes by hand, he must first slowly form each letter in his mind.  And because he has no bone structure in his right sinus area, he must constantly adjust and readjust his eyeglasses to keep them positioned on his nose.

32.     Mr. Bigler also suffered and continues to suffer psychologically from the bombing. He lost colleagues and friends.  He cried frequently, and loud noises caused him distress.  It was a long time before he could hear any kind of loud noise or explosion and not dive under something. He still becomes distressed when the topic of the bombing is raised.

**(Plaintiff Zeikel)**

33.     Plaintiff Zeikel, who was seated next to Plaintiff Bigler in the cafeteria when the truck bomb exploded, also suffered physical and psychological injuries.

34.     He was thrown to the ground by the explosion and lost consciousness.  Upon regaining it, Mr. Zeikel arose and continued with his security duties, assisting with the evacuation of

the Ambassador and other embassy personnel.  He received cuts to his left arm and wrist and had

trouble hearing.  He had shards and pieces of glass embedded in his skin in numerous places which

required painful medical attention from the local emergency responders.

35.     Mr. Zeikel assumed Mr. Bigler's duties over the next few days, and worked with the

influx of numerous officials investigating the event and trying to reestablish the mission.

36.     During that time, Mr. Zeikel discovered the dead bodies of his friends.  He found

Michael Ray Wagner and Kenneth V. Welch (*supra, see also* ¶ 66), with whom he had just visited, dead

in their office shortly after the explosion of the truck bomb.  And he lost another friend, a Lebanese

woman who was a budget and fiscal officer of the embassy. She was not located for days after the

explosion.  Her husband continually searched for her at the embassy and local hospitals.  On the

third day following the explosion, after repeatedly going through the embassy's rubble, Mr. Zeikel

found her remains compressed against the back wall of her office, intermingled with her desk and

office equipment.  She had been decapitated.

37.     After four or five days following the explosion, Mr. Zeikel was evaluated by a State

Department psychologist.  The next day, the Ambassador told him that he had been assessed as

having suffered from shock, and he was ordered to return to the United States to recover.

38.     Mr. Zeikel returned to Beirut approximately one month later to resume service as

one of the Senior Regional Security Officers until a permanent replacement arrived in early 1985.

39.     As a result of the terrorist attack, Mr. Zeikel has suffered many haunted days and

nights.  He continues to suffer residual physical and psychological injuries, including hearing loss in

both ears.

## Plaintiffs Bernard Woerz and Michael Milroy
### (Plaintiff Woerz)

40.     Plaintiff Woerz was serving as the Administrative Officer of the U.S. Embassy in Jordan when he was direct transferred to West Beirut in April 1983, following the Defendant's 1983 terrorist bombing on there on the U.S. Embassy.

41.     In early 1984, Mr. Woerz was instructed to undertake efforts to identify a new site in East Beirut in order to relocate the U.S. diplomatic mission from its temporary location in the British Embassy and the apartments where members of the embassy staff had been housed.

42.     Mr. Woerz was successful in finding a new location, and the Embassy move from West to East Beirut began in the summer of 1984.  The new site was officially known as the U.S. Embassy Annex.

43.     At around midday on September 20, 1984, Mr. Woerz was seated behind his desk in his office on the second floor of the embassy.  The structure had originally been designed as an apartment house, and so Mr. Woerz's office had sliding glass doors to a small balcony that overlooked the road to the front of the building.

44.     Mr. Woerz was speaking with Plaintiff Milroy, the Assistant General Services Officer, when he heard rapid gunshots.  He remained behind his desk while Mr. Milroy walked toward the glass doors.

45.     The explosion occurred shortly after the shooting ended. Mr. Woerz was blown out of his chair and onto the floor.  After several minutes, he stood up.  He was dazed and heard a great deal of screaming.

46.     With someone's assistance, Mr. Woerz stumbled down to the ground floor and exited the building.  He sat bleeding from a cut on his left arm and from the right side of his head. He told someone that Mr. Milroy was still in his office and needed to be found and brought out.

47.     Mr. Woerz was subsequently moved to a local hospital where the wound on his arm was stitched and he was treated for lacerations of the head, scalp, upper extremities, and face. He was covered in shards and fragments of glass.

48.     Physicians could not immediately determine the exact nature of his head injury. They probed inside the wound for some time to no avail.  The probing was done without anesthesia, the effects of which caused pain so severe that Mr. Woerz could not eat solid food for days.

49.     Mr. Woerz was then transported to his home and was given pain medication.  He was not, however, given any antibiotics.

50.     Plaintiff Woerz's arm became extremely infected and swollen.  His wife spent several hours removing visible shards and fragments of glass from his body.

51.     When the State Department's physician subsequently arrived at Mr. Woerz's residence, the physician examined his arm and head, and recommended that he be medevaced to the Israeli military hospital in Tel Aviv.  He was transferred along with Plaintiff Milroy and two other injured embassy personnel on September 22, 1984.

52.     The Israeli doctors determined that the wound to Mr. Woerz's head resulted in a rupture of his right eardrum, and they identified a small piece of shrapnel lodged behind his right eye.  The doctors patched his eardrum and treated his infected arm, but determined that an operation to remove the shrapnel behind his eye would cause more harm than good and, possibly, nerve damage.  It was their opinion that the shrapnel would not move from where it was lodged.

53.     After Mr. Woerz was discharged a week later from the hospital in Tel Aviv, he traveled home to New York where he was seen by his primary care physician.  Thereafter he was seen by a hearing specialist in Washington, D.C., and by the State Department's medical staff.

10

54.     Mr. Woerz was able to return to a desk job at the State Department some weeks later, but his medical clearance to return to Beirut was cancelled after a battery of tests indicated that he was suffering psychologically.

55.     Plaintiff Woerz suffered and continues to suffer from his physical and psychological injuries.  Bits of glass have surfaced from his skin for years.  Physicians have been unable to prescribe MRIs for subsequent medical diagnostic reasons because of the unknown nature of the shrapnel still embedded in Mr. Woerz's head.  The permanent scar on his arm is a constant reminder of the September 20th bombing attack.  He tends to have bouts of depression when he reflects back on that day and, at times, talking about it brings him to tears.  Mr. Woerz's personality, in general, has also been affected.

**(Plaintiff Milroy)**

56.     Mr. Woerz's associate, Plaintiff Milroy, was seriously injured in Mr. Woerz's office when the Defendant's truck bomb exploded.

57.     All that Plaintiff Milroy remembers is that he was discussing business with Mr. Woerz when he heard shots outside the building.  He stood up, turned, and went towards the office windows to try to identify the source of the shooting sounds.  The next thing Mr. Milroy remembered, he was lying on a stretcher virtually naked, and wondering where his clothes and shoes had gone.

58.     Mr. Milroy was taken to a hospital where he was treated for multiple shrapnel wounds to his head, body, arms, and legs.  From there, he was moved to his apartment because of the possibility of further attacks in Beirut.  It was later determined that Mr. Milroy needed to be transported, together with Mr. Woerz and others, to an Israeli military hospital in Tel Aviv.  The doctors there informed him that his left ear had been damaged and his eardrum perforated.  After several days in the Tel Aviv hospital, Mr. Milroy was released to return to the U.S.

59.     Upon Mr. Milroy's arrival in Washington, D.C., he continued treatment at George Washington University Hospital and at the State Department medical unit until he was cleared for further overseas travel, even though he had lost his hearing in his left ear.

60.     Plaintiff Milroy continues to suffer residual physical and psychological injuries.  After more than 19 years of U.S. government service, when Mr. Milroy took his requisite retirement exit medical check in Thailand in 2006, he had surgery to patch his eardrum.  Over the years, many pieces of shrapnel and glass in his body worked their way to the surface and were removed, though there are still fragments that remain.

**Plaintiff Patrick Ruefle**

61.     Plaintiff Patrick Ruefle was a 21-year-old U.S. Marine Corps Corporal on active duty at the time of the September 20th terrorist attack.  After graduating from the Marine Security Guard School in May of 1984, he was assigned to guard the embassy annex in East Beirut which, at the time, was considered the most dangerous diplomatic post in the world.

62.     On the day of the attack, Corporal Ruefle was on post.  After the truck bomb exploded, the immediate physical impact on Corporal Ruefle was on his hearing.  His eardrums were blown out and he suffered non-stop ringing in his hears for three days.

63.     Corporal Ruefle also suffered psychologically from the chaos and confusion that ensued and the horrific scene around the embassy in the aftermath of the truck bomb explosion. With dead and wounded bodies everywhere, Corporal Ruefle immediately took appraisal of the situation and started helping to administer first aid to, and with the evacuation of, the many wounded.

64.     Plaintiff Ruefle aided in the primary care and evacuation of Plaintiff Bigler from the embassy.  After assisting with Mr. Bigler's evacuation and that of the many other wounded, Corporal Ruefle took a lead role in securing the embassy perimeter from further attacks.

12

65. Corporal Ruefle worked alongside his marine corps colleague, Sergeant Richard Paul Brewer, administering first aid and evacuating victims. *See generally, Brewer, et al. v. Islamic Republic of Iran, et al.*, 664 F. Supp. 2d. 43 (D.D.C. 2009) (SGT Brewer was awarded $7 million in compensatory damages for psychological pain and suffering endured as a result of the September 20, 1984 attack; his mother, Joyce Louise Leydet, was given a judgment of $2.5 million compensatory damages for her pain and suffering; and Defendant Iran was held liable for punitive damages in the amount of $300 million).

66. Corporal Ruefle endured the loss of his close personal friends, Petty Officer 1ˢᵗ Class Michael Ray Wagner of the U.S. Navy (*see Wagner, supra*) and U.S. Army Chief Warrant Officer Kenneth V. Welch (*see Welch, supra*), who were the only two Americans killed in the September 20ᵗʰ attack.

67. Plaintiff Ruefle continues to suffer residual physical and psychological injuries to this day, as well as a loss of income. Corporal Ruefle has permanent and irreversible hearing loss. This has negatively impacted his personal life and his military career, resulting in a loss of income. The death of his two good friends weighed heavily on him for years. He still sometimes has nightmares. Loud noises easily frighten him. As a result of the attack, he is also short-tempered and easily stressed.

## Plaintiffs John McKennan and Kevin Barry
### (Plaintiff McKennan)

68. Plaintiffs McKennan and Barry were in a second floor office on the side of the embassy when the Defendants' truck bomb exploded.

69. Neither could hear the rifle fire from the embassy guards shooting at the Defendants' vehicle as it approached the embassy full of explosive, because the exhaust pipe of the 160 KW diesel generator in the basement was positioned just below the office where they were working. When the explosion hit, Mr. McKennan thought he saw a green flash in the window, which

he thought was a rocket-propelled grenade. The force of the wave blew the room's window and debris in on Mr. McKennan, knocking him instantly to the floor.  The explosion shattered his desk, covering him with shards of metal and glass, rendering him unconscious and bleeding.

70.    After the blast, as Mr. McKennan came to, Plaintiff Barry began removing shrapnel and debris off him.  He was assisted downstairs to the first floor to be with others being triaged for medical treatment.

71.    The bomb blast left a crater 20 feet long and eight feet deep in the asphalt in front of the embassy.  Mr. McKennan saw vehicles and vehicle parts burning outside of what was left of the building, along with dismembered human bodies and body parts.

72.    Mr. McKennan was taken to the local El-Arz Hospital in Beirut where there were dozens of people on stretchers. There he saw Plaintiff Bigler, severely wounded, on the stretcher next to him.  He saw that Mr. Bigler was unconscious and his face was split diagonally.  Plaintiffs Woerz and Milroy were in the hospital room next to Mr. McKennan. At a later point, when Mr. Bigler was able to talk, he gave Mr. McKennan his wife's telephone number because he wanted his family to know he was alive.

73.    Mr. McKennan underwent surgery to repair shrapnel wounds to his upper shoulder, neck, head, back, and the upper part of his left ear, which had been severed.

74.    After his surgery, he was transported to Munich, Germany.  Mr. McKennan, together with Plaintiffs Bigler, Milroy, and Woerz, were among 14 seriously wounded Americans and one foreign service national employee who were evacuated for further treatment.

75.    After Munich, Mr. McKennan was sent home to the U.S. for additional medical attention. He was seen by State Department doctors in Washington, who sent him to see ear, nose, and throat specialists.  The exhibiting symptoms of his injuries included head, neck, ear and upper back pain, tinnitus, and dizziness.

14

76.     Mr. McKennan saw a number of medical specialists for blast-related injuries over the next several years, but he asked to return to duty in Beirut to complete his tour.  Soon after returning to Beirut and running protective missions that were subject to direct fire, improvised explosives devices, vehicle bombs and other threats, Mr. McKennan developed uncontrollable tics in both eyes which lasted until he finally left Beirut in 1985.  During his first two assignments after his departure from Beirut, Mr. McKennan continued to have follow-up medical treatment related to the bombing.  Two herniated discs were discovered in his neck.

77.     Plaintiff McKennan continues to suffer residual physical and psychological injuries.  To this day, he is sensitive to loud noises, and has sensitivity in his left ear to such a degree that a routine ear exam leaves him nauseated.  The events of Mr. McKennan's Beirut tour are indelibly etched in his memory.

**(Plaintiff Barry)**

78.     Plaintiff Barry, who was in the same office with Mr. McKennan when the bomb detonated, also suffered injuries from the explosion.  Mr. Barry recalls that the blast enveloped the building.  It knocked the sliding glass door into the office, and Mr. Barry witnessed the door hitting Mr. McKennan on the side of his head.

79.     Sitting near the sliding glass door, Mr. Barry was knocked out of his chair and unconscious.  When he came to, he found himself under debris and ceiling pieces.  The room was covered in dust particles, and Mr. Barry found Mr. McKennan nearby, bleeding and covered in debris.

80.     Mr. Barry scrambled for help, making his way to the ground floor where Marine guards were normally posted.  There he saw Plaintiff Bigler in a pool of blood.  As he worked his way through the chaos in front of the embassy, he saw vehicles on fire, a huge crater in the road, extensive damage to the front façade of the building, particularly the ground floor visa section where

visa applicants normally queued.  He saw the smoldering charred body of someone killed in the explosion.

81.     Mr. Barry eventually made his way to the embassy's main gate.  Along with the embassy's local guard force, U.S. Marine Security Guards, U.S. Milgroup trainers, the Lebanese Armed Forces, and the local militia, he coordinated a semblance of control over swarms of first responders, ambulance and news crews, as well as people from the neighborhood and beyond who rushed to the scene to see what had happened.  The remainder of that day for Mr. Barry was a blur of activity defending against any possible follow-up attack, aiding and evacuating the injured, and preserving the crime scene.

82.     Approximately one or two days later, Mr. Barry discovered that his arm had been injured.  The force of the bomb's blast had dislodged a button that penetrated into his arm.

83.     One week after the blast, and before he left Beirut, Mr. Barry had a car accident.  He was having difficulty judging distances.  Examination results showed partial impairment of vision in his right eye, affecting his peripheral vision. In addition, he could not sleep for many nights.

84.     Plaintiff Barry continues to suffer physical and psychological injuries.  He suffered hearing loss which has carried over to this day.  He has suffered from post-traumatic stress disorder. The devastating blast and his experiences in its aftermath, until he finished his tour in Lebanon in July of 1985, have haunted him since then.

85.     As well as bearing the numerous serious physical disabilities outlined above, caused by Defendant's acts complained of herein, Plaintiffs have undergone, and continue even now to undergo, mental anguish and emotional pain and suffering,

86.     At the time of the bombing, post-traumatic stress disorder was not even recognized as a discrete, treatable condition, and there was no support structure in place through the State

Department to assist Plaintiffs and other victims in coping with the devastating aftermath of the Defendant's attack.

87.     Plaintiffs have received no compensation from the U.S. Government for their injuries.

## Count One
### Private Right of Action under 28 U.S.C. § 1605A(c)

88.     The allegations of ¶¶ 1-87, *supra*, are incorporated herein as if fully set forth.

89.     Defendant Iran was and remains a "state sponsor of terrorism" as that term is defined in 28 U.S.C. § 1605A(a)(2)(A)(i).

90.     Defendant Iran, in committing the acts alleged herein through its agent MOIS acting within the scope of its office, employment or agency, planned and carried out the terrorist attack on the United States Embassy Annex in East Beirut, Lebanon on September 20, 1984.

91.     As a direct and proximate result of the Defendant's willful, wrongful, intentional, reckless and violent acts, Plaintiffs have suffered mental anguish, emotional pain and suffering, and/or economic losses.

92.     Pursuant to 28 U.S.C. § 1605A(c), Plaintiffs may assert a cause of action against Defendant Iran for the injuries and trauma they suffered in the terrorist attack on U.S. diplomatic premises.

93.     Plaintiffs therefore seek compensatory damages of between $5 Million ($5,000,000) and $12 Million Dollars ($12,000,000) each, the amounts awarded to similarly-affected plaintiffs in *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52 (D.D.C. 2010) (Bates, J.) and *Doe, supra*,  as well as punitive damages in light of Defendants' wanton, deliberate, and outrageous conduct.

## Count Two
### Intentional Infliction of Emotional Distress

94.     The allegations of ¶¶ 1-93, *supra*, are incorporated herein as if fully set forth.

95.     On September 20, 1984, Defendant Iran willfully, violently, and forcefully caused the explosion of a truck bomb containing explosive devices that detonated at the U.S. Embassy Annex in East Beirut, Lebanon.

96.     The deliberate introduction and detonation of explosive materials at the U.S. Embassy in Beirut constituted extreme and outrageous conduct on the part of the Defendant, through its agent MOIS, and constituted intentional and foreseeable infliction of severe emotional distress on the Plaintiffs.

97.     Under state statutory and/or common law, each Plaintiff may assert a cause of action for intentional infliction of emotional against the Defendant in connection with its willful, wrongful, intentional, reckless and violent acts.

98.     As a direct and proximate result of the Defendant's willful, intentional, reckless and violent acts, Plaintiffs have suffered and continue to suffer severe emotional distress, entitling them to compensatory damages.

99.     Plaintiffs therefore seek compensatory damages of between $5 Million and ($5,000,000) and $12 Million Dollars ($12,000,000) each, the amounts awarded to similarly-affected plaintiffs in *Valore* and *Doe, supra*, in light of Defendants' wanton, deliberate, and outrageous conduct.

**Count Three**
**Economic Damages**
(Plaintiff Ruefle Only)

100.    The allegations of ¶¶ 1-99, *supra*, are incorporated herein as if fully set forth.

101.    On September 20, 1984, Defendant Iran willfully, violently, and forcefully caused the explosion of a truck bomb containing explosive devices to detonate at the U.S. Embassy Annex in East Beirut, Lebanon.

102.    As a direct and proximate result of the Defendant's willful, intentional, reckless and violent acts, Plaintiff Ruefle incurred economic losses entitling him to compensatory damages.

103.    Under state statutory and/or common law, each Plaintiff may assert a cause of action for economic damages against the Defendant in connection with its willful, wrongful, intentional, reckless and violent acts.

104.    Plaintiff Ruefle therefore seeks economic damages of between $5 Hundred Thousand and ($500,000) and $2 Million Dollars ($2,000,000), the amounts awarded to similarly-affected plaintiffs in *Valore,* and *Doe, supra,* in light of Defendants' wanton, deliberate, and outrageous conduct.

**Count Four**
**Punitive Damages**

105.    The allegations of ¶¶ 1-104, *supra*, are incorporated herein as if fully set forth.

106.    Defendant Iran's actions were intentional and malicious and in willful, wanton and reckless disregard of the Plaintiffs' rights.

107.    Pursuant to 28 U.S.C. § 1605A, which specifically authorizes punitive damages in civil actions for money damages resulting from terrorist acts, Defendant Iran is liable for such in an amount to be determined by the Court.

108.    Plaintiffs therefore seek punitive damages against Defendant Iran in an appropriate amount to be determined at trial.

**Prayer for Relief**

**WHEREFORE**, Plaintiffs Kevin Barry, Alan Bigler, John McKennan, Michael Milroy, Patrick Ruefle, Bernard Woerz, and Jeremy Zeikel respectfully pray that this Honorable Court:

A. **ASSERT** jurisdiction over the subject matter of this action, and over the persons of both Defendants;

B. **GRANT** Plaintiffs judgment on Counts One through Four as set forth above;

C. **AWARD** to Plaintiffs compensatory damages in the amount of $84,000,000;

D. **AWARD** to Plaintiff Ruefle economic damages in the amount of $2,000,000;

E. **AWARD** to Plaintiffs punitive damages in an amount to be determined at trial; and

F. **GRANT** Plaintiffs the costs of suit, including  reasonable attorneys' fees, as well as pre-judgment interest and such other relief as to the Court shall seem just and equitable.


Respectfully submitted,


/s/ Steven M. Schneebaum
_____
Steven M. Schneebaum
    D.C. Bar No, 956250
Cynthia L. McCann
STEVEN M. SCHNEEBAUM, P.C.
1776 K Street, N.W., Suite 800
Washington, D.C. 20008
    Tel.: (202) 742-5900
    Email: sms@smslawdc.com

Of counsel:  Allan Gerson.


Dated: August 10, 2016.