# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| KEVIN BARRY, *et al.* | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 16-1625 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 13, 32 |
| | : | | |
| ISLAMIC REPUBLIC OF IRAN, | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

### GRANTING IN PART AND DENYING IN PART BARRY PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

## I. INTRODUCTION

On September 20, 1984, an explosive-laden van was detonated at the U.S. Embassy Annex ("Annex") in East Beirut, Lebanon, targeting the American servicemembers and embassy employees stationed at that location. The courts of this Circuit have contended with the tragic impact of this attack, which killed fourteen individuals and injured over fifty individuals, in a number of mass tort lawsuits brought under the Foreign Sovereign Immunities Act (FSIA). The 1984 Annex attack continues to resonate before this Court. Among the individuals serving at the Annex at the time of the bombing were foreign service officers Kevin Barry, Alan Bigler, John McKennan, Bernard Woerz, and Jeremy Zeikel; State Department employee Michael Milroy; and U.S. Marine Corps Corporal Patrick Ruefle, who seek compensatory, economic, and punitive damages pursuant to the FSIA. Defendant Iran has not entered an appearance in the more than three years since the suit was filed. This Court must now decide whether to enter default judgment on liability and damages on behalf of these seven Plaintiffs.

## II. BACKGROUND

### A. Factual History[1]

This suit stems from the September 20, 1984, terrorist attack on the U.S. Embassy Annex in East Beirut, Lebanon. On the morning of the attack, a suicide bomber drove a vehicle loaded with explosives toward the building. *See Brewer*, 664 F. Supp. 2d at 47 (citing *Wagner*, 172 F. Supp. 2d at 132). Avoiding the concrete barriers intended to prevent just such an approach, the driver refused orders to stop—leading both Lebanese National Guards and British bodyguards on

---

[1] Under the Federal Rules of Evidence, a court may take judicial notice of "adjudicative facts" "not subject to reasonable dispute" that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), including "court records in related proceedings," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (citing 29 Am. Jur. 2d *Evidence* § 151 (2010)); *Booth v. Fletcher,* 101 F.2d 676, 679 n.2 (D.C. Cir. 1938); 2 McCormick on Evid. § 332 (6th ed. 2009)). Because of the number of individuals affected by terrorist attacks, and the associated "flood of cases that they generate," courts in this Circuit resolving FSIA cases have "regularly" taken judicial notice of the record in related cases. *Goldstein v. Islamic Republic of Iran*, No. 16-CV-2507 (CRC), 2018 WL 6329452, at *2 (D.D.C. Dec. 4, 2018) (citing *Rimkus*, 750 F. Supp. 2d at 171); *see also Murphy v. Islamic Republic of Iran,* 740 F. Supp. 2d 51, 58–59 (D.D.C. 2010); *Brewer v. Islamic Republic of Iran,* 664 F. Supp. 2d 43, 47 (D.D.C. 2009); *Estate of Heiser v. Islamic Republic of Iran,* 466 F .Supp. 2d 229, 262–63 (D.D.C. 2006). Significantly, "courts have taken notice of facts found in earlier proceedings in this District even when those proceedings have taken place in front of a different judge." *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 190 (D.D.C. 2017) (citing *Brewer*, 664 F. Supp. 2d at 54).

As Plaintiffs note, other courts in this Circuit have resolved a number of cases arising out of the 1984 Embassy Annex bombing and/or the 1983 Beirut Embassy bombing. *See, e.g.*, *Brewer*, 664 F. Supp. 2d at 46 (suit involving survivor of 1984 bombing); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 130–33 (D.D.C. 2001) (suit on behalf of individual killed in 1984 Annex attack); *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 7 (D.D.C. 2011) (suit by family members and individuals killed or injured in 1983 or 1984 attacks); *Dammarell v. Islamic Republic of Iran,* 281 F. Supp. 2d 105, 108–113 (D.D.C. 2003) (suit involving over eighty survivors of 1983 Embassy attack). These courts have offered detailed factual reporting of the attacks. The Court takes judicial notice of these and related cases to draw its own, independent findings of fact in the instant case. *See Rimkus*, 750 F. Supp. 2d at 172 ("[C]ourts in FSIA litigation" may, in resolving "subsequent related cases," properly "rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." (citing *Murphy,* 740 F. Supp. 2d at 58–59)).

site to open fire.  *See Wagner*, 172 F. Supp. 2d. at 132.  Before the vehicle could reach the

underground garage, thought to be the driver's destination, the bomb detonated at the front of the

Embassy.  *See id.*; *see also Brewer*, 664 F. Supp. 2d at 47.  The bomb, which was estimated to

contain "some 1500 kilograms of explosives, demolished the embassy building."  *Wagner*, 172

F. Supp. 2d at 132.  This explosion killed over ten individuals, including two American

servicemembers, and injured over fifty others.  *See Estate of Doe*, 808 F. Supp. 2d at 8.  Among

those affected by the blast were the seven Plaintiffs who originally filed the instant suit ("Barry

Plaintiffs").[2]

The seven Barry Plaintiffs were acting in their official duties as employees of the U.S.

government or active members of the U.S. Marine Corps at the time of the attack.  Pls.' Mot.

Default J. 7, ECF No. 13.  Plaintiffs Kevin Barry, Alan Bigler, John McKennan, Bernard Woerz,

and Jeremy Zeikel were employed as Foreign Service Officers at the Embassy Annex.  *Id.* at 4;

*see also* Pls.' Mot. Default J., Attach. A, Declaration of Kevin M. Barry ("Barry Decl.") ¶ 6,

ECF No. 13-1; *id.*, Attach. B, Declaration of Alan Bigler ("Bigler Decl.") ¶ 5, ECF No. 13-2; *id.*,

Attach. C, Declaration of John McKennan ("McKennan Decl.") ¶ 5, ECF No. 13-3; *id.*, Attach.

F, Declaration of Bernard J. Woerz ("Woerz Decl.") ¶ 5, ECF No. 13-6; *id.*, Attach. G,

Declaration of Jeremy S. Zeikel ("Zeikel Decl.") ¶ 6, ECF No. 13-7.  Plaintiff Michael Milroy

---

[2] After the seven individuals described below filed their claims for relief, a motion to intervene as plaintiffs was filed by approximately 468 individuals representing "72 employees or contractors, or the personal representatives of those people, injured or killed in the April 18, 1983 and/or September 20, 1984 bombings of the U.S. Embassy and the U.S. Embassy Annex in Beirut, Lebanon; and (b) 396 immediate family members of those employee/contractor victims, who suffered emotional distress as a result of the attacks on their loved ones" ("Smith Plaintiffs").  Mem. of Seven Barry Pls. 1, ECF No. 25 (citing Consent Mot. 4, Jan. 19, 2018, ECF No. 23).  This Court granted the Smith Plaintiffs' motion to intervene.  *See* Order, Nov. 14, 2017, ECF No. 14.  Because the motion presently before the Court involves only the Barry Plaintiffs, the Court defers further consideration of the Smith Plaintiffs' factual allegations or claims to relief.

was an employee of the State Department employed at the Embassy Annex alongside his wife. *Id.* at 4; *see also id.*, Attach. D, Declaration of Michael Milroy ("Milroy Decl.") ¶ 5, ECF No. 13-4. Plaintiff Ruefle was serving in the United States Marine Corps and assigned to guard the Embassy Annex. *Id.* at 4; *see also id.*, Attach. E, Declaration of Patrick Ruefle ("Ruefle Decl.") ¶ 6, ECF No. 13-5.

When the bomb detonated, the Barry Plaintiffs were positioned at locations throughout the Annex. Four of the men were located on the second floor of the building. *See* Pls.' Mot. Default J. 5. Mr. Barry and Mr. McKennan were working together in an office. *Id.*; Barry Decl. ¶ 8; McKennan Decl. ¶ 6. The men were "propelled out of their chairs," Pls.' Mot. Default J. 5, by the force of the explosion, and Mr. Barry was knocked unconscious, Barry Decl. ¶ 9. Both individuals required immediate medical attention and ongoing medical care to redress their physical injuries as well as lingering psychological effects. *See* Pls.' Mot. Default J. 5; Barry Decl. ¶¶ 17–19; McKennan Decl. ¶¶ 14–17. Another two of the men, Mr. Woerz and Mr. Milroy, were conferring in Mr. Woerz's office on the second floor of the Annex when they heard shots fired. Woerz Decl. ¶¶ 9–11; Milroy Decl. ¶ 6. Shortly after the gunfire concluded, the bomb exploded. Woerz Decl. ¶ 11. Mr. Woerz was "blown out of [his] chair" and knocked unconscious. *Id.* He required treatment at the local hospital, *id.* ¶¶ 12–13, subsequent evacuation to the Israeli military hospital in Tel Aviv, and, upon his return to the U.S., ongoing medical attention for physical and psychological injuries. *Id.* ¶¶ 17–20. Mr. Milroy was injured by the same blast, which knocked him to the ground. Milroy Decl. ¶ 6. His injuries required immediate medical treatment, evacuation to the Tel Aviv military hospital, and ongoing medical care for physical and psychological injuries upon his subsequent return to the U.S. *Id.* ¶¶ 7–9.

The remaining three Plaintiffs were at other locations in the Annex at the time of the explosion. Mr. Bigler and Mr. Zeikel were meeting in the Annex's cafeteria when the bomb denotated. Pls.' Mot. Default J. 5; Bigler Decl. ¶ 6; Zeikel Decl. ¶ 7. Mr. Bigler was injured so severely that he was initially presumed dead, placed in a body bag, and loaded onto a truck to be taken to the morgue. Bigler Decl. ¶ 7. His physical recovery required extensive medical treatment and surgeries over the following year, *id.*, and his physical and psychological suffering were ongoing, *id.* ¶¶ 12–14. Mr. Zeikel was initially knocked unconscious by the blast and, upon awakening, discovered the bodies of friends and colleagues. Pl.'s Mot. Default J. 5; Ziekel Decl. ¶¶ 7, 9. He received medical attention at the scene, *id.* ¶ 12, was diagnosed with "severe shock" and ordered to depart Lebanon, *id.* ¶ 14, and thereafter continued to suffer physical and psychological symptoms, *id.* ¶¶ 16–19. Mr. Ruefle, a U.S. Marine on guard duty at the Annex, was on roving patrol on the morning of the attack. Ruefle Decl. ¶¶ 6–7. He was patrolling in the cafeteria when the bomb detonated, in the same room as Mr. Bigler and Mr. Zeikel. *Id.* ¶ 7. After the explosion, he immediately felt that his ears had been injured but went back into the building and assisted Mr. Bigler as well as other victims. *Id.* ¶ 8. He continued to suffer residual physical and psychological injuries thereafter, *id.* ¶¶ 9–10, and ultimately made the difficult determination that "what happened in Beirut left [him] scared and scarred inside," such that he "knew [he] could not continue to serve," *id.* ¶ 12.

All seven of the Plaintiffs, in short, were directly affected by the tragic events of September 20, 1984, and brought suit against Defendant Iran seeking compensatory, economic, and punitive damages. The Barry Plaintiffs raise both a private right of action under the FSIA and a state law claim for intentional infliction of emotional distress. Iran has not entered an appearance in this action since its commencement over three years ago. The question now

before the Court is whether it is appropriate to enter default judgment regarding liability and damages, as a matter of law, based on the Barry Plaintiffs' claims of mental anguish and emotional pain and suffering. For the reasons set forth below, the Court will enter default judgment and award compensatory damages for each of the seven Barry Plaintiffs, but deny economic damages for Plaintiff Ruefle and deny punitive damages for all Plaintiffs.

## III. LEGAL STANDARD

### A. Default Judgment

Federal Rule of Civil Procedure 55 sets forth a two-step process for a party seeking default judgment: entry of default, followed by entry of default judgment. Fed. R. Civ. P. 55; *see also Int'l Painters & Allied Trades Indust. Pension Fund v. Rose City Class Co., Inc.*, 729 F. Supp. 2d 336, 338 n.3 (D.D.C. 2010) (citing Fed. R. Civ. P. 55; *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986); *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981)). First, after a defendant has failed to plead or otherwise defend against an action, the plaintiff may request that the clerk of the court enter default against that defendant. *See* Fed. R. Civ. P. 55(a). Second, following the clerk's entry of default, and where the plaintiff's claim is not for a sum certain, Rule 55(b)(2) permits the plaintiff to apply to the court for entry of default judgment. *Id.* 55(b)(2). By providing for a two-step process, Rule 55 provides the defendant an opportunity to move the court to set aside the default before the court enters default judgment. *Id.* 55(b), (c).

Although entry of default judgment may at times be appropriate, it is "not automatic." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 74 (D.D.C. 2017) (footnote omitted) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005)). Because "strong policies favor the resolution of disputes on their merits[,]" the court "normally" must view the default judgment as "available only when the adversary process has been halted because of an essentially

unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (per curiam)). Even if a defendant appears "essentially unresponsive," *id.*, the court still has an "affirmative obligation" to ensure that it has subject matter jurisdiction over the suit, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). The court must also "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6–7. "Although the plaintiffs retain 'the burden of proving personal jurisdiction,'" "[i]n the absence of an evidentiary hearing," plaintiffs can "satisfy that burden with a *prima facie* showing." *Braun*, 228 F. Supp. 3d at 74 (internal quotation marks omitted) (quoting *Mwani*, 417 F.3d at 6–7). To make the required prima facie showing, plaintiffs may rely on "their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Mwani*, 417 F.3d at 6–7.

## B. Evidentiary Showing Required by the FSIA

A court addressing an FSIA claim can enter default judgment against a foreign state only if "the claimant[s] establish[] [their] right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief."). This statutory standard mirrors the default judgment standard of Federal Rule of Civil Procedure 55(d). *See Hamen v. Islamic Republic of Iran*, No. 16-1394 (RDM), 2019 WL 3753800, at *1 (D.D.C. Aug. 7, 2019) (citing *Owens v. Republic of Sudan*, 864 F.3d 781, 785 (D.C. Cir. 2017), *cert granted sub. nom. Opati v. Republic of Sudan*, 1395 S. Ct. 2771 (2019); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003)). The "FSIA leaves it to the court to determine precisely how much and what kinds of evidence [] plaintiff[s] must provide, requiring

only that it be 'satisfactory to the court.'" *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)). A court making a determination about the evidence required must bear in mind Congress's statutory purpose in enacting a private right of action in section 1605A of the FSIA: to "compensate[] the victims of terrorism [and thereby] punish foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Id.* at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 88–89 (D.C. Cir. 2002)). In parsing the evidence that plaintiffs offer, "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) (citing *Rimkus*, 750 F. Supp. 2d at 171). "Uncontroverted factual allegations that are supported by admissible evidence are taken as true." *Braun*, 228 F. Supp. 3d at 74–75 (citing *Roth*, 78 F. Supp. 3d at 386; *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 56 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011)); *see also Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007) (citing *Greenbaum v. Islamic Republic of Iran,* 451 F. Supp. 2d 90, 94–95 (D.D.C. 2006)).

## IV.  ANALYSIS

Applying the legal standards set forth above, in order to enter default judgment in this FSIA suit, the Court must, as a threshold matter, first ensure that it has subject matter jurisdiction over the Barry Plaintiffs' claims and, second, confirm that it may properly exercise personal jurisdiction over the Defendant. Then, if it finds that jurisdiction is proper, the Court must decide liability and damages. For the following reasons, the Court finds that it has original jurisdiction over this suit pursuant to the FSIA, that it has personal jurisdiction over Defendant

Iran, and that the Barry Plaintiffs have established liability and a right to relief in the form of compensatory damages.

## A. Jurisdiction[3]

Subject to an adequate showing by the Barry Plaintiffs, the FSIA both waives Defendant's sovereign immunity and grants this Court subject matter jurisdiction over this suit. The FSIA also separately provides procedural requirements to establish personal jurisdiction. For the reasons set forth below, the Court concludes that it has jurisdiction here.

### 1. Waiver of Sovereign Immunity

The Defendant in this suit is the Islamic Republic of Iran, a foreign state. The statute under which Plaintiffs bring suit, the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604, is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the FSIA, "a foreign state, including its instrumentalities, is immune from suit in state or federal court unless the case falls within an express statutory exception." *Hamen*, 2019 WL 3753800, at *9 (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004)); *see also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015). A defendant's failure to appear does not waive the immunity defense, *see Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983), and "a district court considering a claim against a foreign state must decide

_____

[3] 28 U.S.C. § 1330 confers federal district courts with "original jurisdiction" in FSIA cases. The statute provides that original jurisdiction exists "without regard to amount in controversy" in "any nonjury civil action against a foreign state" that "seeks relief *in personam*," and for which "the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a). In this case, the Barry Plaintiffs have not demanded a jury trial and seek only monetary damages, *see generally* Compl., and Defendant Iran is plainly a foreign state. Thus, the Court will focus on the final element: whether Defendant Iran is "not entitled to immunity," such that the Court may exercise subject matter jurisdiction over Plaintiffs' claim.

whether an exception to immunity applies" even if the defendant foreign state never enters an

appearance, *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 323 (D.D.C. 2014).

The relevant exception in this case is the statute's "terrorism exception," codified at 28

U.S.C. § 1605A.[4]  *See Bettis*, 315 F.3d at 329.  The terrorism exception provides that a foreign

state is not immune in "any case" in which "money damages are sought against a foreign state

for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft

sabotage, hostage taking, or the provision of material support or resources for such an act."  28

U.S.C. § 1605A.  The FSIA "plaintiff bears [the] initial burden of production to show an

exception to immunity, such as § 1605A, applies," whereupon, if the defendant fails to appear,

"jurisdiction attaches."  *Owens*, 864 F.3d at 784.

In addition, the terrorism exception applies only if two prerequisites are met: (1) the

foreign state was designated as a "state sponsor of terrorism at the time of the act,'" and "remains

so designated when the claim is filed," 28 U.S.C. § 1605A(a)(2)(A)(i)(1) and (2) the "claimant or

victim was" a "national of the United States," "a member of the armed forces[,]" or "otherwise

an employee of the Government of the United States . . . acting within the scope of the

employee's employment" at the time of the act, 28 U.S.C. § 1605A(a)(2)(A)(ii)).[5]  *See also*

---

[4] As originally enacted, the "terrorism exception" was codified at 28 U.S.C. § 1605(a)(7). *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 329 (D.C. Cir. 2003); *see also Owens*, 864 F.3d at 763–64.  In 2008, Congress repealed § 1605(a)(7), replacing it with a new "Terrorism exception to the jurisdictional immunity of a foreign state" codified at 28 U.S.C. § 1605A.  *See Owens*, 864 F.3d at 765.  "The new exception withdrew immunity, granted jurisdiction, and authorized suits against state sponsors of terrorism for 'personal injury or death' arising from the same predicate acts . . . as had the old exception."  *Id.*  Thus, the jurisdictional grant remained the same under both versions of the exception.  The new exception extended the categories of individuals who could bring suit, *id.*, and, as the Court addresses in the following sections, "authorized a '[p]rivate right of action' against a state over which a court could maintain jurisdiction under § 1605A(a)."  *Id.* (quoting 28 U.S.C. § 1605A(c)).

[5] The FSIA also contains a third requirement: "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign

*Mohammadi*, 782 F.3d at 14; *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-1214 (JEB), 2019 WL 3037868, at *3 (D.D.C. July 11, 2019). The Court will first assess whether these prerequisites are met and then consider whether the terrorism exception confers subject matter jurisdiction in the instant case.

### a. Requirements for a Claim to be Heard Under Section 1605A

Here, both of section 1605A's prerequisites are met. First, Iran has been designated a state sponsor of terrorism since 1984, *see* 49 Fed. Reg. 2836-02 (Jan. 23, 1984), and has remained so designated ever since, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Aug. 23, 2019). Second, at the time of the 1984 attack, all seven Barry Plaintiffs fell within one of the categories enumerated in section 1605A(a)(2)(A)(ii). Six of the seven Plaintiffs were U.S. nationals at the time of the bombing. Under the FSIA, the term "U.S. national" has the same meaning "given that term in section 101(a)(22) of the Immigration and Nationality Act," 28 U.S.C. § 1605(h)(5), which defines "national of the United States" as "a citizen of the United States," 8 U.S.C. § 1101(a)(22). For each the Barry Plaintiffs other than Mr. Milroy, Plaintiffs' declarations establish American citizenship at the time of the bombing on September 20, 1984. Barry Decl. ¶ 3 ("I have at all times been, and still am, an American citizen."); Bigler Decl. ¶ 3 (stating same); McKennan Decl. ¶ 3 (stating same); Ruefle Decl. ¶ 3 (stating same): Woerz Decl. ¶ 3 (stating same); Zeikel Decl. ¶ 3 (stating same). The Court is to take these uncontroverted factual statements as true. *See Braun*, 228 F. Supp. 3d at 74–75 (citing *Roth*, 78 F. Supp. 3d at 386; *Gates*, 580 F. Supp. 2d at 56). Thus, because Mr. Barry, Mr. Bigler, Mr. McKennan, Mr. Ruefle,

---

state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(A)(iii). Because the alleged act of terrorism implicated here occurred in East Beirut, Lebanon, this provision does not apply with regard to Defendant Iran.

Mr. Woerz, and Mr. Zeikel were U.S. citizens when the bombing occurred, they were U.S. nationals at the time of the attack and thereby meet the statutory requirement. Mr. Milroy was not an American citizen at the time of the bombing in September 1984. *See* Milroy Decl. ¶ 3 ("I . . . was granted U.S. citizenship in Alexandria, Virginia in October 1984."). However, he "began work as a U.S. Government employee" at the Embassy Annex before the 1984 bombing. *Id.* ¶ 5. At the time of the attack, he was "discussing business with . . . Plaintiff Bernard J. Woerz, in his office." *Id.* ¶ 6. Taking these uncontroverted factual statements to be true, *see Braun*, 228 F. Supp. 3d at 74–75, the declaration establishes that Mr. Milroy was a government employee acting within the scope of his employment at the time of the attack. Thus, Mr. Milroy also meets the statutory requirement. The Court accordingly finds that the Barry Plaintiffs have met their burden of production to establish that section 1605A applies.

### b. *1605A's Waiver of Sovereign Immunity*

As discussed previously, an exception to sovereign immunity exists for a foreign defendant when the FSIA claimant seeks [1] "money damages" [2] "against a foreign state" for [3] "personal injury or death that [4] was caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1) (alterations added); *see also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 50–51 (D.D.C. 2012); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 32 (D.D.C. 2012). Here, the Court finds that each of these elements is met. Prongs one and two are straightforward: Plaintiffs seek money damages in the form of compensatory, economic, and punitive damages against Defendant Iran, a foreign state. Compl. at 20. Plaintiffs' pleadings and declarations also satisfy prong three. Plaintiffs allege personal injuries, including direct physical injury such as head trauma, shrapnel wounds, eardrum perforation, severe lacerations,

and vision impairment, and ongoing physical as well as psychological harm. *See* Compl. ¶¶ 22–87.

So, too, do Plaintiffs satisfy their burden regarding the fourth prong, causation. Causation in a FSIA suit is established when the plaintiff shows proximate cause, or "some reasonable connection" between the defendant's act and "the damages which the plaintiff has suffered." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010); *see also Owens*, 864 F.3d at 794 (affirming proximate cause as the jurisdictional standard pursuant to 28 U.S.C. § 1605A). Here, Plaintiffs allege that Defendant Iran, "through its instrumentality the Ministry of Information and Security ('MOIS'), was responsible for" their injuries in the 1984 bombing. Compl. ¶ 1. The Court, taking judicial notice of evidentiary findings in other cases in this jurisdiction to draw its own conclusions of fact, *see Rimkus*, 750 F. Supp. 2d at 172, agrees.

In numerous other cases in this jurisdiction, courts have linked Iran to the 1984 bombing. *Estate of Doe*, 808 F. Supp. 2d at 7 ("[C]ourts in this district have held in several cases that defendants Iran and MOIS directed and facilitated the . . . . 1984 attack[] on the U.S. Embassy [Annex].")*; see also Brewer,* 664 F. Supp. 2d at 47; *Wagner,* 172 F. Supp. 2d at 133. In these cases, "it has uniformly been agreed that, in the relevant time period, Hizbollah received substantial funds and support from Iran via its Ministry of Information and Security and the Iranian Revolutionary Guard Corps." *Estate of Doe*, 808 F. Supp. 2d at 7 (citations omitted). And, as is most significant here, courts have not only made a "general connection between Hizbollah and Iran, but also" laid the groundwork to "justify a specific finding that defendant[] [Iran] provided support for the 1984 attack on the U.S. Embassy Annex in Lebanon." *Id.* (citing *Wagner,* 172 F. Supp. 2d at 133; *Welch v. Islamic Republic of Iran*, No. 01-863, 2007 WL 7688043 (CKK) (AK), at *27 (D.D.C. Sept. 20, 2007); *Brewer,* 664 F. Supp. 2d at 54). Based on

the substantial records and evidentiary findings in these cases, and considering the Barry Plaintiffs' pleadings in this case, the Court concludes that the Barry Plaintiffs have established that Iran's support for the 1984 Annex attack has a "reasonable connection" to the injuries they allege.

This showing also suffices to meet the fifth prong of section 1605A. A FSIA plaintiff's claims must arise out of, as relevant here, "extrajudicial killing . . . or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(1). Under section 1605A, "[e]xtrajudicial killing" is given the meaning accorded to the term in section 3 of the Torture Victim Protection Act of 1991, *id.* § 1605A(h)(7), which defines it as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," Pub. L. No. 102-256 § 3(g), 106 Stat. 73 (1992). "[M]aterial support or resources" is defined by reference to section 2339A of title 18, *see* 28 U.S.C. § 1605A(h)(3), which provides in relevant part that "'material support or resources' means any property, tangible or intangible, or service," 18 U.S.C. § 2339A. The Court finds that the bombing of the Embassy Annex, in which a vehicle loaded with explosives was detonated in close to proximity to a government building full of U.S. and foreign employees, plainly qualifies as a "deliberated killing" as that term is defined by the FSIA. And taking judicial notice of the voluminous evidentiary records compiled by other district courts in this Circuit, as described above, it further finds that Iran provided "material support or resources," as defined by the FSIA, for terrorist actors to carry out the attack.

Accordingly, § 1605A's subject matter jurisdictional requirements are met, and Iran's sovereign immunity is waived with respect to the Barry Plaintiffs' claims.

## B. Personal Jurisdiction

As stated previously, the FSIA also imposes further procedural requirements regarding personal jurisdiction.  "Personal jurisdiction exists over a non-immune sovereign so long as service of process has been made as required by section 1608" of the statute.  *Estate of Heiser*, 466 F. Supp. 2d at 255 (citation omitted); 28 U.S.C. §1330(b) ("[P]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title.").  Section 1608 permits service to be effected in four ways: [1] "special arrangement for service between the plaintiff and the foreign state or political subdivision;" [2] "in accordance with an applicable international convention on service of judicial documents;" [3] if service cannot be effected by either of these two methods, "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," or [4] if service cannot be made via the third method, " by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted."  28 U.S.C. § 1608(a).

In this case, neither of the first two options applies.  There is no "special arrangement" between the Barry Plaintiffs and Iran, nor is there "an applicable international convention" with

Iran.  28 U.S.C. § 1608(a); *see also* Aff., Aug. 22, 2016, ECF No. 3.  The Barry Plaintiffs

initially attempted to effectuate service using the third method.  *See* Aff., Aug. 22, 2016.  When

service was not successful with this method, they did so with the fourth method and requested

that the Office of the Clerk send the necessary papers to Iran "under diplomatic notes."  Aff.,

Feb. 3, 2017, ECF No. 5.  Thus, the Barry Plaintiffs have met § 1608's requirements for service

of process, and the Court may properly exercise personal jurisdiction over Defendant.

### C.  Liability

With this jurisdictional brush cleared, the Court now confronts the matter of Defendant's

liability.  In so doing, it bears in mind that "the question [of] whether a statute withdraws

sovereign immunity is 'analytically distinct' from whether a plaintiff has a cause of action."

*Owens*, 864 F.3d at 807 (citing *FDIC v. Meyer*, 510 U.S. 471, 484 (1994); *United States v.*

*Mitchell*, 463 U.S. 206, 218 (1983)).  Thus, although section 1605A creates a private right of

action for claimants who meet its other requirements, a FSIA plaintiff must further "prove a

theory of liability," *Valore*, 700 F. Supp. 2d at 73, to establish a claim for relief that entitles them

to damages, *Rimkus*, 750 F. Supp. 2d at 175–76.  In articulating the "justification for such

recovery," plaintiffs in section 1605A actions "generally" turn to "the lens of civil tort liability."

*Rimkus*, 750 F. Supp. 2d. at 175–76; *see also, e.g.*, *Schertzman Cohen*, 2019 WL 3037868, at *5

(discussing *Valore* and *Rimkus*).  "Based on the D.C. Circuit's guidance, district courts in this

jurisdiction 'rely on well-established principles of law, such as those found in the Restatement

(Second) of Torts . . .' to define the elements and scope of these theories of recovery."  *Worley*,

75 F. Supp. 3d at 335 (quoting *Oveissi*, F. Supp. 2d at 54); *see also Fraenkel v. Islamic Republic*

*of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018) ("The courts are not authorized to craft a body of

federal common law in deciding FSIA terrorism exception cases.  However, a district court may

rely on well-established statements of common law." (citing *Bettis*, 315 F.3d at 333)). This Court follows that approach in addressing the Barry Plaintiffs' claims.

The Barry Plaintiffs' complaint moves for relief under two general legal theories.[6] Count one is styled as a "Private Right of Action under 28 U.S.C. § 1605A(c)," Compl. at 17, "for the injuries and trauma they suffered in the terrorist attack on U.S. diplomatic premises," *id.* ¶ 92. Count two is an IIED claim under "state statutory and/or common law." *Id.* ¶ 97. Because Section 1605A(c) "provides a private right of action" without any "guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages," *Braun*, 228 F. Supp. 3d at 78, the Court must still identify a "theory of liability," *Valore*, 700 F. Supp. 2d at 73, to apply to the Barry Plaintiffs' claim for relief. The Barry Plaintiffs' section 1605A(c) theory of relief alleges "mental anguish, emotional pain and suffering, and/or economic losses," Compl. ¶ 91, and seeks damages "in light of Defendants' wanton, deliberate, and outrageous conduct," *id.* ¶ 93. Based on this plain text, which seeks relief for mental and emotional anguish and pain and suffering, the Court construes count one as invoking the federal private right of action to obtain relief via "the lens of [the] civil tort" of intentional infliction of emotional distress (IIED). *Rimkus*, 750 F. Supp. 2d. at 175–76. Count two asserts a "state statutory and/or common law" IIED theory of relief.[7] For the following reasons, the Court will enter default judgment on liability for the Barry Plaintiffs' § 1605A(c) claim.

---

[6] The Court separately considers Mr. Ruefle's stand-alone economic damages claim, *see* Compl. ¶¶ 100–04, in its analysis of damages in Part IV.D.

[7] Because the FSIA provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, the Barry Plaintiffs may invoke a state law claim alongside their federal cause of action, *see Owens*, 864 F.3d at 221. That said, "in most cases brought under . . . [§ 1605A's] terrorism exception, the plaintiff need not rely upon state tort law." *Id.* As set forth below, this case follows the usual pattern, and the Barry Plaintiffs need not rely upon state tort law.

### 1.  Plaintiffs' FSIA Claim for IIED

Under general principles of tort law, a defendant is liable for IIED if its "extreme and outrageous conduct intentionally or recklessly causes severe emotional distress" to a plaintiff. Restatement (Second) of Torts § 46(1); *see also Roth*, 78 F. Supp. 3d at 400 (quoting *Estate of Heiser*, 659 F. Supp. 2d at 26).  Here, the first element of the IIED tort—an extreme or outrageous act that is intended to cause severe emotional distress—is plainly met.  By its very definition, an act of terrorism is "extreme and outrageous and intended to cause the highest degree of emotional distress."  *Valore*, 700 F. Supp. 2d at 77 (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)).  The Court has no difficulty concluding that Iran's role in the 1984 Annex bombing was "intended to cause the highest degree of emotional distress[:]" "terror."  *Estate of Heiser*, 659 F. Supp. 2d at 26.

Moreover, the Barry Plaintiffs have provided evidence that the Defendant's provision of material support or resources for the Annex bombing caused "severe emotional distress" to them, thereby satisfying the second element of the tort.  The FSIA requires plaintiffs to "establish[] [their] claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  In this case, all seven of the Barry Plaintiffs have provided declarations that detail the immediate and ongoing psychological toll of the attack, which each of the men directly experienced.  Mr. Barry witnessed the injury and death of friends and colleagues, and the "gruesome things" he experienced "still haunt[]" him and lead him to "avoid large crowds and cringe at loud, unexpected noises."  Barry Decl. ¶¶ 15, 17–19.  Mr. Bigler was injured to such an extent that he was presumed dead and placed in a body bag, Bigler Decl. ¶ 7, and thereafter was so affected that he "cried frequently" and for a "long time" could not "hear any kind of loud noise or explosion" without "div[ing] under something," *id.* ¶ 14.  Mr. McKennan lives with the "attack

and mass casualty emergency treatment during [his] Beirut tour" "indelibly etched in his memory," experiencing extreme sensitivity to "loud noises and sudden or unexpected movements by others" and struggling with medical treatments such as blood draws or "intravenous therapy" that "take [him] back to [his] stretcher in El-Arz [Hospital]." McKennan Decl. ¶ 17. Mr. Milroy "continue[s] to carry the psychological scars of remembering [his] colleagues who died, and those who were injured alongside [him]." Milroy Decl. ¶ 9. Mr. Ruefle was so "shaken and scarred" by "what happened in Beirut," that he could no longer continue as an active duty Marine. Ruefle Decl. ¶ 12. Mr. Ruefle had never seen a dead person before the day of the attack, when he witnessed his "two good friends lying dead in the Embassy," and he still "sometimes ha[s] nightmares" about the "gruesome sight" and remains "easily frightened," "startled by loud noises," "short-tempered," and "easily stressed" as "a direct result of the attack." *Id.* ¶ 11. Mr. Woerz suffered psychologically in the wake of the attack to the extent that he was "unfit for reassignment abroad." Woerz Decl. ¶ 19. His friend and housemate, Petty Officer First Class Michael Wagner, was among those killed in the attack, *id.* ¶ 11, and subsequent psychological testing indicated that he "was suffering psychologically" and was "extremely angry, sad, and conflicted," *id.* ¶ 19. Mr. Zeikel, who entered the Annex to search for survivors after the bomb detonated, was subjected to a number of gruesome images that "still haunt[] him." Zeikel Decl. ¶ 13. He saw the mangled bodies of Mr. Wagner and U.S. Army Chief Warrant Officer Kenneth V. Welch, individuals with whom he had "laughed and joked" just hours before, *id.* ¶ 9, and he later discovered the decapitated corpse of a Lebanese co-worker at the Embassy, *id.* ¶ 13. Mr. Zeikel was evaluated by a State Department psychiatrist and assessed with "suffering from severe shock" to the extent that he was "ordered out of Lebanon." *Id.* ¶ 14. Even today, he finds it "difficult not to tear up" when discussing the events

of that day and the 1983 Embassy Marine Barracks bombing, for which he also participated in the rescue operation. *Id.* ¶¶ 17–19. Based on these filings, the Court finds it clear that the Annex bombing directly caused great psychological distress to each of these seven survivors of the attack. Thus, applying general tort law principles, Iran is liable to the Barry Plaintiffs for the tort of IIED.[8]

### D. Damages

The final question facing this Court is the measure of damages to award. The FSIA's private cause of action permits plaintiffs to seek "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c).[9] In this suit, the Barry Plaintiffs seek compensatory damages, Pls.' Mot. Default J. 11, and punitive damages against Defendant Iran, Compl. ¶ 108. Mr. Ruefle also seeks economic damages. Compl. ¶¶ 101–04. The Court will first briefly discuss punitive damages before turning to Plaintiffs' other claims for relief. For the following reasons, the Court denies Plaintiffs' motion for punitive damages, denies Mr. Ruefle's

---

[8] Because the Court finds liability on this ground, it declines to reach Barry Plaintiffs' state law IIED claim (count two), which arises from the same predicate acts and does not provide any further right to recover. *See Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir.) ("Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of . . . theories which the plaintiff pursues.").

[9] The FSIA requires plaintiffs to make an adequate evidentiary showing before a court may award damages: "To obtain damages against defendants in a FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Salazar v. Islamic Republic of Iran,* 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (internal quotations omitted) (quoting *Hill*, 328 F.3d at 681); *see also Wultz*, 864 F. Supp. 2d at 37. As previously discussed, the Barry Plaintiffs have established that Iran's provision of material support and resources for an act of extrajudicial killing was intended to injure individuals at the Annex. Thus, they have discharged their burden of proof to show that the consequences of Iran's act were reasonably certain, and the sole question for this Court is the damages amount.

motion for default judgment for economic damages, and grants the Barry Plaintiffs' motion for default judgment for compensatory damages.

### 1. Punitive Damages

The Barry Plaintiffs seek punitive damages for an attack that occurred in 1984. Under the law of this Circuit, "the FSIA terrorism exception does not retroactively authorize the imposition of punitive damages against a sovereign for conduct occurring before the passage of § 1605A" in 2008. *Owens*, 864 F.3d at 812. This directive controls the outcome here: because Defendant's alleged conduct occurred twenty-four years before the passage of section 1605A, the Barry Plaintiffs may not obtain punitive damages. Thus, the Court denies the Barry Plaintiffs' motion for entry of default judgment regarding punitive damages.[10]

### 2. Economic Damages

Mr. Ruefle seeks economic damages in addition to the Barry Plaintiffs' collective claim for compensatory damages. Compl. ¶¶ 101–04. He seeks to recover on the ground that the physical and psychology injuries he suffered in the 1984 Annex bombing harmed his career prospects and economic earnings. Mr. Ruefle states that, but for the impact of the Annex bombing, he "believe[s] [he] would have been able to establish a career in the Marines" and "continually progress in rank and earning capacity." Ruefle Decl. ¶ 13. In the career path he instead pursued in the Army National Guard, his hearing loss led the U.S. Army to "continually put restrictions on what type of MOS (Military Occupancy Specialty) jobs" he "could pursue, and in which environments." *Id.* Mr. Ruefle further states that his hearing loss "negatively impacted" his civil career opportunities by putting him "at a competitive disadvantage as

___

[10] This conclusion would not change under a state tort theory of liability. *See Owens*, 864 F.3d at 818 ("[A] plaintiff proceeding under either state or federal law cannot recover punitive damages for conduct occurring prior to the enactment of § 1605A.").

compared to [his] peers." *Id.* A plaintiff must "support [a] claim for lost earnings with competent evidence." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015). Here, however, neither Mr. Ruefle's declaration nor any other filings offer any quantification of economic loss. Without such quantification, speculation about negative career impact does not provide the "competent evidence" required to support his lost earnings claim. Thus, the Court denies Mr. Ruefle's motion for entry of default judgment regarding economic damages.

### 3. Compensatory Damages

Each of the seven Barry Plaintiffs seek compensatory damages of "no less than $5,000,000 for Defendant's intentional infliction of physical injuries as well as emotional distress that resulted from" the 1984 Annex bombing. Pls.' Mot. Default J. 11. To determine a pain and suffering award for the survivor of an attack, courts consider a number of factors, including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *O'Brien v. Islamic Republic of Iran,* 853 F. Supp. 2d 44, 46 (D.D.C. 2012) (quoting *Peterson v. Islamic Republic of Iran,* 515 F. Supp. 2d 25, 52 n.26 (D.D.C. 2007), *abrogation on other grounds recognized in Mohammadi v. Islamic Republic of Iran,* 947 F. Supp. 2d 48, 65 (D.D.C. 2013)). Because "the Court must take pains to ensure that individuals with similar injuries receive similar awards," *Peterson,* 515 F. Supp. 2d at 54, courts in this jurisdiction confronting FSIA claims have developed a framework for the calculation of damages, *see Valore,* 700 F. Supp. 2d at 84.

Courts generally "begin[] with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages." *Wultz,* 864 F. Supp. 2d at 37–38 (citing *Peterson,* 515 F. Supp. 2d at 37). Courts may adjust the award amount

upward or downward to reflect the severity of the injuries. An upward adjustment to $7–12 million has been found appropriate "in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead." *Valore,* 700 F. Supp. 2d at 84. A downward departure to $1.5–3 million has been found appropriate where victims suffered relatively more minor injuries, such as "minor shrapnel injuries," *id.*, or "severe emotional injury accompanied by relatively minor physical injuries," *Estate of Doe*, 943 F. Supp. 2d at 186. The award of damages for physical injuries "assume[s] severe psychological injuries." *Schertzman Cohen*, 2019 WL 3037868, at * 6 (citing *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 92–93 (D.D.C. 2014), *aff'd in part, vacated in part on other grounds sub nom. Owens*, 864 F.3d at 825). The Court commences its analysis with this framework, while recognizing that "it is 'undeniably difficult' to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where"—as here— "severe mental anguish is involved." *Brewer*, 664 F. Supp. 2d at 57 (quoting *Blais v. Islamic Republic of Iran,* 459 F. Supp. 2d 40, 58 (D.D.C. 2006)). No weighing of injuries can perfectly reflect the measure of individual suffering.

The Court makes the following adjustments from the $5 million baseline in light of each of the Barry Plaintiffs' specific declarations.

### a. Mr. Barry

On the day of the bombing, Mr. Barry was struck unconscious and a brass button was embedded in his arm. Barry Decl. ¶¶ 10 & n.1, 12. Subsequent medical testing revealed damage to his right eye that affected his peripheral vision, *id.* ¶ 15, and hearing loss that has never fully returned, *id.* ¶ 17. Because Mr. Barry lost hearing and vision function due to the bombing, the

Court finds an upward adjustment to $7 million appropriate. *See Valore*, 700 F. Supp. 2d at 84 (noting upward departure of $7–12 million in cases where victims "partially lost vison or hearing"); *Brewer*, 664 F. Supp. 2d at 57 (awarding $7 million in compensatory damages to victim of 1984 Annex bombing who continues to suffer from constant ringing in the ears, back pain, and migraine headaches).

### b. Mr. McKennan

After the bomb's detonation, Mr. McKenna required surgery to treat shrapnel wounds to his upper shoulder, neck, head, back, and his upper left ear, which was partially severed. McKennan Decl. ¶ 12. Thereafter, he suffered from ongoing pain in his head, neck, ear, and upper back pain, as well as tinnitus and dizziness, *id.* ¶ 14, and subsequently developed "uncontrollable tics in both eyes which lasted" until he departed Beirut in 1985, *id.* ¶ 15. He was later diagnosed with two herniated discs in his neck, *id.* ¶ 16, and he continues to suffer from extreme sensitivity in his left ear, *id.* ¶ 17. Given the extent of Mr. McKennan's injuries, *see* McKennan Decl. Ex. 2, ECF No. 13-3 (documenting medical treatment over five years) and the ongoing effect on his hearing, the Court finds an upward departure to $7 million appropriate.

### c. Mr. Milroy

Mr. Milroy was blown to the ground by the bombing. Milroy Decl. ¶ 6. His extensive shrapnel wounds required 100 stitches, and his eardrum was perforated. *Id.* ¶ 7. The injuries did not heal on that day: the damage to his left ear resulted in hearing loss, and over many years, the shrapnel and glass embedded in his body "worked their way to the surface" and were removed, "though there are still fragments that remain." *Id.* ¶ 9. He received surgery in 2006 to patch his perforated eardrum. *Id.* In light of these lasting injuries and Mr. Milroy's hearing loss, the Court finds an upward departure to $7 million appropriate.

### d. Mr. Ruefle

For Mr. Ruefle, the "immediate physical impact" in the wake of the explosion was "in his ears." Ruefle Decl. ¶ 8. Despite the inability to hear very well, he retained his "composure and mobility" and was able to assist others around him, including Mr. Bigler. *Id.* He worked for hours, covered in blood, "to assist those who were in worse shape." *Id.* Only when the adrenaline subsided in the weeks after the bombing did Mr. Ruefle realize that he "was not the same inside [his] head." *Id.* ¶ 9. In addition to ongoing psychological injuries, he also suffered "permanent and irreversible hearing loss" that has affected his personal life and his career opportunities. *Id.* ¶ 10. Thus, the Court finds an upward departure to $7 million appropriate.

### e. Mr. Woerz

After the explosion, Mr. Woerz was transported to a hospital for treatment of a wound on his arm and the lacerations on his head, neck, scalp, and upper extremities. Woerz Decl. ¶ 13. Because they were unable to diagnose the "exact nature of the [head] laceration," doctors at the hospital "probed inside the wound" without any anesthetic or pain medication, causing pain so severe that it prevented Mr. Woerz from moving his jaws to chew solid food for days. *Id.* After he was evacuated to another hospital, doctors there "determined the wound to [his] head resulted in a rupture of [his] right eardrum and identified a small piece of shrapnel lodged behind [his] left eye." *Id.* ¶ 16. Because of the risk associated with surgery to remove the shrapnel, *id.*, it remains embedded in Mr. Woerz's body, and he cannot undergo MRI examinations because of its "unknown nature," *id.* ¶ 20. Bits of embedded shrapnel continue to surface from other areas of his body. *Id.* Given the permanent physical injuries that Mr. Woerz suffered and continues to suffer, the Court finds an upward departure to $7 million appropriate.

### f. Mr. Zeikel

Mr. Zeikel was knocked unconscious by the bomb and, when he awoke, found himself covered in blood with impaired hearing, head pain, and sharp pain in his left knee. Zeikel Decl. ¶ 7. He was able to assist others who were wounded and search for survivors, *id.* ¶ 9, before receiving medical attention later that day, *id.* ¶ 12. Local responders removed "large pieces of glass" from Mr. Zeikel's hand and arms. *Id.* Thereafter, he "suffered headaches for many months, hearing loss in both ears, and a painful knee injury." *Id.* ¶ 16. The hearing loss in both ears continues to this day, and the knee surgery he required to treat his injury "limits [his] participation in some physical activities." *Id.* ¶ 17. The Court finds that this pain and suffering warrants an upward departure to $7 million.

### g. Mr. Bigler

Mr. Bigler was blown across the room by the bomb and sustained injuries so severe that he was presumed dead, placed in a body bag, and loaded onto a truck bound for the morgue. Bigler Decl. ¶ 7. He required extensive medical treatment and dental work as well as "monthly visits for surgeries, mostly facial and sinus, but also for repair of [his injured] finger." *Id.* ¶ 12. Mr. Bigler was left without any bone structure in his right sinus area, a scar across the entirety of his face, and difficulty using his hand each time he writes. *Id.* ¶ 13. He also still experiences "constant pain" in his left leg, head pain, and lacks any feeling in his right jaw. *Id.* Mr. Bigler suffered significant trauma and severe physical injuries on the day of the bombing, of which a number of the other Barry Plaintiffs take note. *See, e.g.*, Ruefle Decl. ¶ 8 ("The closest person to me, and in dire straits, was Mr. Bigler."). He also sustained ongoing physical injuries. The Court thus finds an upward departure to $9 million appropriate. *See Valore*, 700 F. Supp. 2d at

84 (noting upward departure of $7–12 million in cases where victim suffered relatively more numerous or severe injuries or was placed in body bag).

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for default judgment regarding liability and compensatory damages is **GRANTED**, Plaintiff Ruefle's motion for default judgment regarding economic damages is **DENIED**, and Plaintiffs' motion for default judgment regarding punitive damages is **DENIED**. The Court awards compensatory damages in the amount of $51 million, with $7 million apportioned to Mr. Barry, Mr. McKennan, Mr. Milroy, Mr. Ruefle, Mr. Wortz, and Mr. Ziekel, respectively, and $9 million apportioned to Mr. Bigler. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 4, 2019                                                            RUDOLPH CONTRERAS
                                                                                                       United States District Judge